J-S43028-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| KE.B.-W., ON BEHALF OF MINOR CHILDREN | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| J.W. | |
| Appellee | No. 287 WDA 2017 |

Appeal from the Order Entered January 31, 2017
In the Court of Common Pleas of Allegheny County
Family Court at No(s): FD 16-7135-002

BEFORE: STABILE, J., SOLANO, J., and FITZGERALD, J.[*]

MEMORANDUM BY SOLANO, J.:                    **FILED AUGUST 16, 2017**

Appellant, Ke.B.-W. ("Mother"), appeals from the order dated January 31, 2017, dismissing her petition for protection from abuse ("PFA") against J.W. ("Father") on behalf of the parties' three minor children, A.B.-W. (born 2008), Ad.B.-W. (born 2013), and Ka.B.-W. (born 2013), and vacating the temporary PFA order that was entered September 19, 2016. The case dealt mainly with claims that Father had sexually abused his son, A.B.-W., and one of his daughters, Ka.B.-W. We are constrained to affirm.

The facts and procedural history are as follows:

[Mother] initiated the instant matter on January 20, 2016 by lodging with this Court a California custody order between herself and [Father] pertaining to the parties' three children. Mother then asked the [trial c]ourt to assume jurisdiction over

_____

[*] Former Justice specially assigned to the Superior Court.

the custody order, which provided Father with equally shared custody of the children after an 18 month step-up period.[1] Mother also filed a petition to modify the custody order, alleging that Father spent significant time employed out-of-state, which, Mother averred, the California custody order did not contemplate. Mother sought to prevent Father's physical custody step-up, while Father sought to enforce the Order. The parties thus began litigating custody matters, proceeding through the Generations Program[2] and filing varied and numerous motions seeking interim relief from th[e trial c]ourt.

During said litigation, Mother raised claims that Father had physically abused her in the past. She then — on September 19, 2016 — filed a Protection From Abuse ("PFA") petition. Therein, Mother alleged, among other things, that [Ka.B.-W.] complained "that her vagina was hurting" and that Father had "touched her vagina." Mother further averred that [Ka.B.-W.] claimed that Father digitally penetrated her. Finally, Mother pled that [A.B.-W.] had previously claimed to have been straddled and held down by Father, who threatened to harm Mother if [A.B.-W.] disclosed such behavior.

[On September 19, 2016, a] temporary PFA order was entered against Father. Prior to the final hearing on Mother's PFA Petition, [on November 16, 2016, Allegheny County Children, Youth, and Families ("CYF")] determined that the sexual allegations pertaining to [Ka.B.-W.] were unfounded.[3] Mother

_____

[1] The children would stay with Father for increasingly longer periods of time.

[2] The Generations Program is Allegheny County's mandatory alternative dispute resolution program for child custody disputes.

[3] Pursuant to 23 Pa.C.S. § 6303(a), an "unfounded report," is "[a]ny report made pursuant to [the Child Protective Services Law, 23 Pa.C.S. §§ 6301-6386,] unless the report is a 'founded report' or an 'indicated report.'" Section 6303(a) defines a "founded report" as one resulting from an adjudication of child abuse, a placement into an accelerated rehabilitative disposition program based on child abuse, or a protection from abuse order relating to a child. It defines an "indicated report" as:

a report of child abuse made pursuant to this chapter if an investigation by the department or county agency determines

*(Footnote Continued Next Page)*

- 2 -

then represented that [A.B.-W.] had made allegations of sexual abuse against Father.  Per Consent Order of October 27, 2016, the parties agreed that [A.B.-W.]'s allegations would be included and heard with Mother's original PFA Petition.  [On December 12, 2016,] CYF . . . determined that the allegations pertaining to [A.B.-W.] were unfounded.  The police also declined to file charges against Father.

Trial Ct. Op. at 1-2.

The matter ultimately proceeded to a PFA hearing.  Although the issues raised by Mother on appeal are limited, we review the record from the PFA hearing in some detail here because of the serious and disturbing nature of the allegations and the ultimate decision rendered by the trial court.

One of Mother's issues relates to testimony at the PFA hearing by Stan Katz, Ph.D.  Dr. Katz is a clinical and forensic psychologist who had been appointed by the California court during Mother and Father's custody proceedings to evaluate the parties for the purpose of determining custody. ***See generally*** N.T. at 83-126.  A significant issue in this case was whether charges of child abuse that were made by two of the children against Father were based on suggestive statements made to them by Mother.  Prior to the

*(Footnote Continued)* ————————

that substantial evidence of the alleged abuse by a perpetrator exists based on any of the following:

(i) Available medical evidence.

(ii) The child protective service investigation.

(iii) An admission of the acts of abuse by the perpetrator.

23 Pa.C.S. § 6303(a)(1).

hearing, Mother filed an omnibus pre-trial motion that, among other things, sought to exclude testimony by Dr. Katz that might be relevant to this issue and also sought to exclude a custody evaluation report that Dr. Katz prepared in March 2015. The custody evaluation report by Dr. Katz itself does not appear in the certified record, but excerpts were read into the record during the PFA hearing. *Id.* at 99-104, 112. These excerpts discussed an injury to A.B.-W.'s foot and Dr. Katz's general impression of A.B.-W. based upon at least six interviews he had with the child between October 2014 and December 20, 2014. Dr. Katz had no contact with the parties or their children after completing the custody evaluation interviews. Mother argued that his report was not relevant and contended: "[a]ny testimony provided by Dr[.] Katz as it relates to the PFA before this court is predictably related to 'whether Father **would** sexually abuse the children' based [on] 'whether Mother **would** make this up' based on his stale psychological report [and] amounts to clear inadmissible character evidence." Am. Omnibus Pre-trial Mot., 1/19/17, at ¶ 27, R.R. 15 (emphasis in original).[4] The trial court deferred ruling on this particular issue until the hearing. Order, 1/24/17, at ¶ 3, R.R. at 20.

The final PFA hearing took place on January 25 and 26, 2017. The trial court described the hearing as follows:

---

[4] We cite to the reproduced record for the parties' convenience.

- 4 -

The [trial c]ourt viewed and admitted into evidence — per the parties' stipulation — videotapes of forensic interviews of both [Ka.B.-W.] and [A.B.-W.]. The former never testified live, however the latter did.[5] Among other things, he explained that when the parties lived in California, his Father began to have anal sex with him and placed a cube-shaped object into his anus. *See* [N.T.] at 13-14, 17, 21-22, 24-25.[6] [A.B.-W.] testified that such conduct continued after the parties had moved to Pennsylvania. *Id.* at 15-17. [A.B.-W.] also described various disclosures he made regarding Father's alleged abuse and certain physical afflictions he experienced since the averred abuse began. *Id.* at 16-19. [A.B.-W.] additionally explained that there is nothing good about his Father and nothing bad about his Mother. *Id.* at 23.[7] Finally, [in volunteered information following the conclusion of his formal testimony, A.B.-W.] also testified that Father would attempt to have him perform anal sex on Father and that Father threatened to harm him if [A.B.-W.] ever told anyone about the alleged abuse. *Id.* at 27.[8]

_____

[5] The parties stipulated that A.B.-W. was competent to testify. N.T. at 5. Mother never requested a hearing to determine that competency.

[6] A.B.-W., who was eight years old at the time of the hearing, testified that his father "stuck something in my bum hole." N.T. at 13. When asked what it was, he responded, "His penis." *Id.* at 17. He said that this happened "a lot," both in California and after his family moved to Pennsylvania, and that in California it happened "[a]bout 50 percent of the time." *Id.* at 13-16. He described how he began "fake sleeping" after the first time the alleged assault occurred, and that, as he did, Father "would come in and stick it in. He would be breathing funny and stick something in my bum." *Id.* at 16-17; *see id.* at 23-24. When asked if his father also "put a cubed-shaped object in your bum," A.B.-W. responded affirmatively and said that the object felt like it had five sides. *Id.* at 24-25.

[7] This testimony consisted only of "Yes" or "No" answers to single questions about whether there was anything good about each parent. N.T. at 23.

[8] After A.B.-W.'s testimony was concluded, and as the trial court was dismissing him, the court asked, "[I]s there anything else you want to tell us?" A.B.-W. replied: "Yes. I was too afraid to tell anyone except Angela [his therapist at the time of the PFA hearing] and my Mom, but he would do it the other way around. He would pull my pants down and try to get it up
*(Footnote Continued Next Page)*

Trial Ct. Op. at 2-3.

During his testimony, A.B.-W. admitted that he did not tell a forensic interviewer from Children's Hospital of Pittsburgh, Jennifer Ginsberg, that his father had performed anal sex on him because he was "really embarrassed" at his first forensic interview. N.T. at 15-16. A.B.-W. also testified that he told Mother about the abuse both before and after his first forensic interview with Ms. Ginsberg, although Mother would later testify that A.B.-W. did not tell her about the abuse until the day after that forensic interview. *Id.* at 16, 212. With respect to A.B.-W.'s second forensic interview by Ms. Ginsberg, A.B.-W. answered "No" when Mother's counsel asked him, "You didn't tell her then it was [Father's] penis?" *Id.* at 18. When Mother's counsel asked A.B.-W. if he remembered "everybody you told about what your dad did to you," A.B.-W. answered that he told Ms. Ginsberg, among others. *Id.*

Mother testified about, among other things, Ka.B.-W.'s allegations of abuse by Father. She testified that Ka.B.-W. said "her vagina hurt." N.T. at

_(Footnote Continued)_ _____

to his bum. . . . He tried to sit on me so my penis would go up his bum but it never did." N.T. at 27. A.B.-W. testified, "Sometimes [Father] would be like, he talked to himself like threatening." *Id.* at 30. After being asked whether Father "would talk to himself and threaten you at the same time," A.B.-W. agreed. *Id.* When asked to clarify whether Father "was talking to himself" or if "[i]t was like a threat," A.B.-W. agreed to both. *Id.* A.B.-W. continued that Father would say, "[I]f you tell anyone about this I'll hurt you," or "I will hurt your Mom." *Id.* A.B.-W. added that the threat was "something like that" and that "it wasn't every time, it was every other time." *Id.*

81.[9]  Mother further testified that Ka.B.-W. told Mother's mother that "Daddy touched my vagina." *Id.* at 82.  The children's maternal grandmother did not testify.  Mother also testified that she spoke with Detective Richard Keebler of the Allegheny County Police Department's Sex Crimes Division.  *Id.* at 175-76.

After Mother's own testimony, Mother's next witness was Wendy Nel Bacdayan, A.B.-W. and Ka.B.-W.'s regular pediatrician, who testified that, on September 16, 2016, "[Ka.B.-W.] said, '[Y]es, he puts his fingers in my vagina when I'm sleeping.'"  N.T. at 32, 34.  Ka.B.-W. made this disclosure in her family room with Mother present, not in a clinical environment with only Dr. Bacdayan or other clinicians present.  *Id.* at 35, 171.  Mother testified that, when Dr. Bacdayan asked Ka.B.-W. (who at this time was about three years old) if she knew what her private area was called, Ka.B.-W. gave a correct answer:  "In my vagina."  *Id.*[10]

Dr. Bacdayan testified that on September 22, 2016, she met with A.B.-W. for a routine "checkup."  N.T. at 35.  A.B.-W. told her that Father had "not touched him anywhere that made him uncomfortable but he does do some type of gorilla posture" that A.B.-W. did not like.  *Id.* at 36.

---

[9] The record is unclear as to whether, in this context, Ka.B.-W. used the word "vagina" or if this language is Mother's.  N.T. at 81.

[10] Mother also testified that, before Ka.B.-W. answered, "she looked at me," but the record is unclear whether Mother was referring to Ka.B.-W. or Dr. Bacdayan.  N.T. at 171.

A.B.-W. was physically normal. *Id.* The record does not indicate whether Mother was in the room at the time of A.B.-W.'s statement.

Dr. Radhika Movva, a physician with Wesley Spectrum Services (a mental health and social services agency), also testified for Mother, specifically about A.B.-W. and psychological therapy that she provides to him. *See* N.T. at 53-60. Dr. Movva's initial evaluation of A.B.-W. was in August 2016 and her follow-up evaluation was on October 13, 2016. *Id.* at 53. During the October evaluation, Mother, who was present in the room during the evaluation, prompted A.B.-W. about being touched on the back. *Id.* at 57-60. Dr. Movva stated that A.B.-W. did not then make a disclosure of sexual abuse — "he just said that [Father] touched him on the butt." *Id.* at 58. She continued that A.B.-W. did not indicate that it was sexual in nature and that Father "just touched him one time." *Id.* at 59.

Mother also called Ms. Ginsberg, the forensic interviewer from Children's Hospital of Pittsburgh, who testified about her forensic interviews of Ka.B.-W. on October 3, 2016, and of A.B.-W. on October 3[11] and November 18, 2016, and who explained about forensic interviews generally and disclosures of abuse. *See* N.T. at 127-45. Ms. Ginsberg presented her credentials, stating that she has conducted approximately 500 forensic

---

[11] Mother testified that A.B.-W. had not made any disclosures to her prior to his interview with Ms. Ginsberg on October 3, 2016. N.T. at 212. Mother explained that she brought A.B.-W. with her that day "because Detective Keebler told [her] to" do so. *Id.* at 177.

interviews over the course of five years, has an undergraduate degree in psychology and a master's degree in social work, and has attended the National Forensic Interviewers Training course. *Id.* at 128. Ms. Ginsberg testified that, during all of her forensic interviews, including A.B.-W.'s and Ka.B.-W's, she adheres to the protocol of the American Professional Society on the Abuse of Children.

Ms. Ginsberg testified that, during her forensic interview, Ka.B.-W. "did not make a disclosure of sexual maltreatment," N.T. at 128, and that A.B.-W. denied that he was abused at the time of her first forensic examination of him, *id.* at 131-32. When asked why she did not ask A.B.-W. "more probing questions," she explained that her "job is not to interrogate him" — she cannot ask leading questions. *Id.* at 137. For example, a standard question is what would the child do if a man asked to show him or her his privates; here, A.B.-W. answered that he would "tell his mom." *Id.* at 141. Ms. Ginsberg testified that A.B.-W. did say Father stood on top of him on all fours in some sort of gorilla pose while A.B.-W. was lying down, but neither she nor the observers who were present throughout the interview considered this experience a cause for concern. *Id.* at 144-145.[12]

Megan Liska, another therapist from Wesley, testified about her therapeutic treatment of A.B.-W. *See* N.T. at 42-51. She stated that

---

[12] Ms. Ginsberg did not clarify who these observers were.

A.B.-W. had undergone therapy with her for one hour per week between September 2015 and October 2016 for anxiety and concentration concerns. *Id.* at 43. Ms. Liska identified the sources of A.B.-W.'s anxiety as his relationship with Father, transitioning to a different state and a new school, his social interactions concerning athletic competitions, and "daily functioning." *Id.* Ms. Liska identified custody transitions between parents as another source of anxiety. *Id.* at 44-45.[13] She worked with A.B.-W. on various coping skills to treat his anxiety and gave him weekly assignments to decrease his anxiety. *Id.* at 44. Ms. Liska testified that she was "aware of one time that [A.B.-W.] did set a fire due to feeling anxious." *Id.* at 46.[14] Ms. Liska testified that, during over a year of therapy sessions, A.B.-W. had "never disclosed any sexual abuse" to her. *Id.* at 48-49.

Dr. Brian Davies, a pediatrician in the same practice as Dr. Bacdayan, testified to physical symptoms suffered by A.B.-W., including vomiting and an upset stomach. N.T. at 70-72; *see also* Trial Ct. Op. at 3. Dr. Davies met with A.B.-W. one time on January 4, 2017, and he did not determine the underlying cause. N.T. at 70-71.

---

[13] Ms. Liska referred to "transition between homes" and "transition between parents." N.T. at 45. Ms. Liska never stated that A.B.-W. was more anxious transitioning from Mother to Father than vice versa. *Id.*

[14] Ms. Liska did not explain how she became "aware" that A.B.-W. set a fire nor provide any details regarding the incident. N.T. at 46.

Linda Nolfi, one of A.B.-W.'s teachers, testified about A.B.-W.'s anxiety during Mother's case in chief. N.T. at 190-93; Trial Ct. Op. at 4. She testified that she was not aware of A.B.-W. exhibiting any problems of a physical or sexual nature while in her classroom. N.T. at 192-93.

Kathryn Taylor, A.B.-W.'s school guidance counselor, also testified about A.B.-W.'s anxiety. N.T. at 195. She further testified that on December 14, 2016, A.B.-W. told her that Father "put something in [his] bottom." *Id.* at 197. A.B.-W. did not provide any additional details to her. *Id.* at 196. At the time of A.B.-W.'s disclosure, Ms. Taylor already knew "there was an investigation going on." *Id.* She spoke favorably of A.B.-W.'s willingness to disclose to her. *Id.* She added that, to the best of her knowledge, A.B.-W. has not been involved in any inappropriate sexual acts at school, either with himself or with other children. *Id.* at 197.

Mother called Davida Pace to testify as an expert witness regarding "forensic interviews, forensic interview techniques, disclosures of abuse made by children during and as a result of forensic interviews, and typical physical symptoms of children experiencing sexual abuse." Trial Ct. Op. at 4 (citing N.T. at 146-69). Ms. Pace is the forensic interview supervisor for the Guidance Center Program in Wayne County, Michigan, and has conducted approximately 3,000 forensic interviews. N.T. at 147-48. Ms. Pace has a bachelor's degree in psychology and a master's degree in counseling. *Id.* at 148. Ms. Pace testified that repeated interviewing of children "is a bonus"

and "a useful tool resulting in additional information [about] the alleged abuse or whatever the topic is for that interviewee." *Id.* at 148-49. Ms. Pace emphasized, however, that it is "extremely important to point out that it is only accurate when unbiased interviewers are conducting those interviews and they are using appropriate interviewing techniques" and that a forensic interviewing method should always be employed. *Id.* at 149, 152-53.

Ms. Pace testified that, "[w]hen a child starts to disclose it's in steps. . . . [W]hen they're ready to disclose, they disclose." N.T. at 153-54. She testified that "the most common signs that were found in sexual[ly] abuse[d] children are withdrawal, fear of being around the suspected perpetrator, not doing well in school whether it's grade school behavior, not doing well at home with behavior, [and] regressing to earlier stages in child development." *Id.* at 156. When asked by Mother's counsel if "fire setting" would "fall within behavioral problems that you might identify in that category," Ms. Pace answered affirmatively. *Id.* Ms. Pace further explained that preschool-age children are "really susceptible to coaching," but "eight, nine[,] ten-year[-]old[s], they developed their own sense of self and what is right and what is wrong." *Id.* at 157. She testified that false allegations of abuse against parents or other persons can be the result of coaching. *Id.* at 158, 165. She continued that, while characteristics in a child such as anger, anxiety, and fear could be attributable to abuse, if the child displayed these

characteristics all along, then they could not specifically be attributed to abuse. *Id.* at 160. Ms. Pace could not answer when asked, "What general negative characteristic of a child does not apply to child sexual abuse?" *Id.* at 161. Ms. Pace further explained that sometimes a child actually "clings" to the person who abused him or her. *Id.* at 169.

Mother's final witness was Angela Miskanin, who is employed as a therapist with the Center for Victims. N.T. at 199. Ms. Miskanin has a master's degree in art therapy with a specialization in counseling; she did not discuss whether she has training in forensic interviewing. *Id.* Ms. Miskanin testified that, prior to her current employment, she had never been employed as a therapist. *Id.* She began therapy with A.B.-W. in October 2016, and had seen him about a dozen times when she testified. *Id.* at 199-200. Ms. Miskanin testified that A.B.-W. told her that Father "had put something in his butt and slapped and grabbed his butt." *Id.* at 200. These "disclosures" were made in January 2017 and, possibly, also in November 2016; she could not remember the precise dates. *Id.* at 204. She admitted that it was not part of her job to determine the truth of any allegations. *Id.* at 203.

Father also testified. He categorically denied sexually abusing A.B.-W. and denied the allegations of sexual abuse towards Ka.B.-W. N.T. at 265, 268-69. He opined that Mother's allegations against him are "part of a pattern," *id.* at 269, R.R. at 101, and noted that CYF found the allegations of

abuse to be unfounded and law enforcement ultimately ceased its investigation. *Id.* at 267-78.[15] When asked if he "know[s] his son to be a liar," Father answered, "Up until the PFAs, no." *Id.* at 287-88.

Additionally, Father presented the testimony of Shenoa Williams, a certified registered nurse practitioner trained in pediatrics. N.T. at 62. On September 16, 2016, Nurse Williams had examined Ka.B.-W. approximately twenty-four hours after Ka.B.-W. had left an overnight visit with Father, and she found Ka.B.-W. to have a normal ano-genital exam. *Id.* at 62-65. On October 6, 2016, Nurse Williams also examined A.B.-W., including performing a "full skin evaluation as well as an ano-genital evaluation." *Id.* at 66. Again, she found no maltreatment. *Id.* at 67.

Dr. Katz then testified via telephone on issues arising between the parties and their children while they lived in California. *See* N.T. at 83-126. During the parties' custody proceedings in the California courts, the parties executed a stipulation, signed by a California judge, that appointed Dr. Katz as a child custody evaluator. *Id.* at 84, 88. Mother objected to Dr. Katz's testimony on the basis of limiting language in the stipulation. *Id.* at 90-91. The trial court overruled that objection. *Id.* at 93.

Dr. Katz stated that he has had no contact with the parties or their children since completing his custody evaluation in March 2015. N.T. at 99.

---

[15] Father confirmed that he "did . . . speak with" Detective Keebler and Detective Corinne Orchowksi, neither of whom were called to testify at the PFA hearing. N.T. at 268.

During the course of the custody evaluation, Dr. Katz conducted at least six interviews with A.B.-W.: two alone, one with each parent, and one at each parent's home. *Id.* at 102-03, 112, 124.

During Dr. Katz's testimony, Father's counsel directed him to page 32 of his report, in which Dr. Katz discussed an injury to A.B.-W.'s foot. He stated that "[A.B.-W.] had indicated that 'his father either sat on his foot or stepped on it, although he does not recall it happening nor did he observe it to happen.'" N.T. at 100. Mother objected to testimony about this matter on the basis that "it has no relevance. It has absolutely no relevance unless [Father] is trying to introduce it as character evidence." *Id.* at 100. The parties engaged in the following colloquy:

> [FATHER'S COUNSEL:] Mother is saying that these really happened, Father is saying that Mother was involved in this process.
>
> [MOTHER'S COUNSEL]: But they haven't produced any evidence that Mother actually told [A.B.-W.] to say that.
>
> [FATHER'S COUNSEL]: That's because I haven't finished my question. That's because I haven't been allowed to finish my question.
>
> THE COURT: Really what you're saying is the evidence of the child is tainted by Mother.
>
> [MOTHER'S COUNSEL]: That's character evidence.

*Id.* at 101. The trial court overruled Mother's objection. *Id.* Dr. Katz was then asked, "What do these statements lead you to believe, what is your professional view on it?" *Id.* at 103. Dr. Katz responded:

- 15 -

[A.B.-W.] did break a toe. Mother was trying to figure out how he broke his toe. [A.B.-W.] did not have a memory of what happened, so she was hypothesizing that maybe he stepped on it, maybe Dad stepped on it because it was a definite injury to it. Father thought it was maybe a spider bite. So I did not find that [s]he was intentionally alienating him at that time or trying to fabricate but that she was suggesting maybe that his toe was stepped on because she couldn't understand why it was broken.

*Id.*

Without further objection, Dr. Katz then moved on to his general impressions of A.B.-W. Dr. Katz believed that A.B.-W. had "incorporated" Mother's opinions "in his own emotional vocabulary" and would repeat assertions of things that Mother "told him" that Father had done to him. *Id.* at 103-04. For example, Dr. Katz noted that A.B.-W. "spontaneously added that his mother told him that on one occasion his father held him down on the ground." *Id.* at 104. Dr. Katz asserted that A.B.-W. "is, to some degree, mirroring [Mother's] distrust of [Father]" and that A.B.-W.'s "comments . . . suggest that he has heard a number of negative or at least cautionary comments about his father from his mother." *Id.* Dr. Katz added: "Even when [A.B.-W.] talks about the incident during which time [Father] inappropriately held him down, he states that [he] does not recall specifically, but that his mother told him about it." *Id.* at 108.

Dr. Katz further testified that, during his two psychological interviews with A.B.-W. without a parent present, A.B.-W. never raised claims of sexual abuse and never exhibited "any symptoms or behaviors consistent with being a sexually-abused child." N.T. at 123-25. By symptoms or behaviors,

he explained that sexually abused children "will often demonstrate hyper-sexual arousal," "will be more sexualized," "talk about sexual themes," "act out sexually," "can be masturbating," and "are reported to be sexual with peers." *Id.* at 125-26. With A.B.-W., Dr. Katz "didn't see any of these behaviors at all nor were they reported to [him]." *Id.* at 126.

Dr. Katz also testified, without objection:

> [I]t's important to understand how a child's memory is impacted by a parent and if they're being influenced by a parent to make certain comments or have certain beliefs. . . . [C]hildren's memory is highly impacted by suggestibility. . . . So it's a fairly complex process and when we look at these children who have memories we have to merely trace back how it was elicited, who it was told to, and if there is any confirmatory evidence of it. . . . [R]ecency is a major factor so the more recent the event happened, the more accurate the memory is. Memories get distorted over time, exaggerated and diminished also.

N.T. at 105, 122-23.

Father called Amy Roenker, a probation officer who has worked for the juvenile court for eleven years and was appointed by the trial court to supervise Father's custody of the parties' children. She "testified, among other things, that she saw nothing inappropriate for him." Trial Ct. Op. at 5 (citing N.T. at 255-64). She also related that Ad.B.-W. and Ka.B.-W. "run to [Father], they give him hugs and kisses. It's not out of the ordinary of a typical father-daughter relationship." N.T. at 256. She has seen nothing from Father that would concern her. *Id.* at 257. On December 27, 2016, A.B.-W. told her that "Dad put something in his butt – not today way back." *Id.* Ms. Roenker described the disclosure as "out of the ordinary" and not

made in the context of a conversation. *Id.* at 258. At this time, "the grandparents were still" present, but A.B.-W. made the disclosure to her rather than them. *Id.* at 259.

Father's next witness was Andrew Fleming, a CYF caseworker who testified about CYF's investigation into the allegations of abuse against Father. *See* N.T. at 300-23. Mr. Fleming stated that CYF began its investigation by interviewing Mother on September 16, 2016; according to Mr. Fleming's written record of Mother's interview, she stated that Father had never physically abused her. *Id.* at 301-02. Mr. Fleming testified that CYF then forensically interviewed Ka.B.-W. on October 3, 2016; Ka.B.-W. made no disclosures of maltreatment. *Id.* at 306. Mr. Fleming continued that when A.B.-W. was informally interviewed on October 12, 2016, and then forensically interviewed on November 16, 2016, after being given "multiple opportunities" to make disclosures, the child denied that he was abused. *Id.* at 303-05. Mr. Fleming further testified that CYF also interviewed Father on October 12, 2016. *Id.* at 306. Mr. Fleming added that CYF had attempted to interview Ad.B.-W. but was unable to do so. *Id.* at 308.

Mr. Fleming testified that CYF deemed the allegations as to Ka.B.-W. to be unfounded on November 16, 2016. N.T. at 305-08. He noted that CYF had also issued an "unfounded letter" as to Ad.B.-W. on December 12, 2016, but the exact nature of the allegations as to Ad.B.-W. are unclear from the

record. ***Id.*** at 305-08.[16]  That same date, CYF found that allegations regarding A.B.-W. were unfounded due to "contradictory statements, lack of specificity and clarity throughout." ***Id.*** at 305-07.  When asked to explain what he meant by "contradictory statements" and "no specificity," Mr. Fleming clarified:

> Originally not making any kind of disclosure initially but no specificity.  Multiple interviews were done where he would give a piece of information and later kind of built on a reason behind it. . . .
>
> [D]uring the forensic interview that was in November when describing the incident that happened with [Father] at [Father]'s house every other weekend, he was describing the object inserted [into] his rectum but there was a lack of specificity of what the characteristics were.

***Id.*** at 307.

In sum, the testimony revealed the following with respect to the charges of sexual abuse of the children:

- Ka.B.-W. alleged sexual abuse by Father on September 16, 2016, to Dr. Bacdayan, while in Mother's living room with Mother present.  A pediatric nurse practitioner examined Ka.B.-W. that same day, and the result of her ano-genital exam was normal.  Ka.B.-W. did not disclose any maltreatment during a forensic interview conducted by CYF on October 3, 2016.

---

[16] Mr. Fleming's testimony is the only place in the record that any allegations of abuse by Father against Ad.B.-W. are asserted.

- A.B.-W. testified at the January 25, 2017 hearing that Father had anal sex with him and had inserted a cube or five-sided object into his anus when he lived in California (that is, before August 2015); that the abuse "happens a lot" and continued after the parties moved to Pennsylvania; and that Father also tried to have A.B.-W. perform anal sex on Father and voiced threats during the sexual encounters. In corroboration of some of that testimony, (1) Ms. Miskanin, one of A.B.-W.'s therapists, testified that A.B.-W. disclosed to her that Father "had put something his butt and slapped and grabbed his butt" possibly as early as November 2016, and had reiterated that disclosure to Ms. Miskanin several times in January 2017; (2) in December 2016, A.B.-W repeated the allegation that Father "put something in [his] bottom" or "put something in his butt – not today way back," once to his school guidance counselor, and a second time to a probation officer who was supervising Father's custody of the children, but did not make that second disclosure to his grandparents, who were also present, and did not provide additional details during either disclosure; and (3) on January 4, 2017, A.B.-W. was treated for such physical symptoms as vomiting and stomach upset, but the cause of the issues was never diagnosed. On the other hand: (1) although A.B.-W. testified that he had disclosed the abuse to Mother before and after his first forensic interview, Mother testified that he did not tell her until after the interview; (2) on September 22, 2016, just three days after the temporary PFA order was

- 20 -

entered, A.B.-W. did not disclose any abuse to Dr. Bacdayan; (3) Ms. Liska, A.B.-W.'s therapist between September 2015 and October 2016, testified that A.B.-W. never disclosed sexual abuse; (4) during a forensic interview at Children's Hospital of Pittsburgh on October 3, 2016, A.B.-W. denied that he was abused; (5) a pediatric nurse practitioner testified that A.B.-W.'s ano-genital exam was normal as of October 6, 2016; (6) on October 12, 2016, A.B.-W. denied being abused at a CYF informal interview, but one day later, at Mother's prompting, A.B.-W. told Dr. Movva about Father touching him once "on the butt"; and (7) on November 16, 2016, A.B.-W. again denied being abused at a CYF forensic interview.

During closing argument, Mother's counsel contended that the trial court could not "rely on the history" of the parties' "relationship to suggest that Mother is responsible for [A.B.-W.]'s testimony," because "that's character evidence and completely inadmissible in the court." N.T. at 336. During his closing, Father's counsel did not argue that Mother had suggested anything to the children nor tainted their testimony. *See id.* at 331-33.

On January 31, 2017, the trial court denied Mother's request for a PFA. The trial court later explained:

> [C]ognizant of its role as fact-finder and exclusive determiner of credibility, the [trial c]ourt acknowledges that testimony was presented at the hearing from which the Court **could** find that Father abused his children . . . . However, the [trial c]ourt — after having the benefit of hearing all of the live witnesses and viewing the forensic interviews, *see Ferko-Fox v. Fox*, 68 A.3d 917, 924 (Pa. Super. Ct. 2013) (noting that the "trial court's ability to view [witnesses'] facial expressions and mannerisms

- 21 -

during the . . . hearing is critical to an ability to render its credibility determinations" (first alteration added)) — found that Father's denials of abuse were credible [and] that [A.B.-W.]'s testimony of abusive conduct by Father was not credible (and thus any disclosures he made to others . . . were simply disclosures of incredible claims), and that the evidence pertaining to [Ka.B.-W.] did not demonstrate by a preponderance of the evidence that abuse occurred.

Accordingly, th[e trial c]ourt's credibility determinations and evaluation of the evidence, caused the [trial c]ourt to deny Mother's request for PFA relief. Simply put, the credible and persuasive evidence revealed that Father did not abuse his children. . . .

The [trial c]ourt recognizes that [A.B.-W.] testified to abuse and that Mother presented multiple witnesses at the hearing who, among other things, testified (i) to disclosures of alleged abuse by Father of both [A.B.-W.] and [Ka.B.-W.], (ii) that [A.B.-W.] presented symptoms of an abused child, and (iii) that disclosures of abuse can become more detailed and more frequent after the initial disclosure is made. The [trial c]ourt also viewed the relevant forensic interviews and is aware that Mother presented more witnesses than Father did. That said — and as noted above — such testimony and witnesses did not convince the [trial c]ourt that Father sexually abused his children. Indeed, the [trial c]ourt found Father's testimony to the contrary to be credible.

. . . [T]he [trial c]ourt believed Father's testimony that he did not abuse his children and found Mother's case — including the testimony of [A.B.-W.], Mother, and all of her other witnesses — to be insufficiently credible to demonstrate that Father abused his children by a preponderance of the evidence.

*Id.* at 6-10 (emphasis in original; footnote omitted).

Mother filed a timely appeal and now raises the following issues:

1.     Whether the [t]rial [c]ourt abused its discretion and committed reversible error in admitting character evidence.

- 22 -

2.      Whether the [t]rial court abused its discretion and committed reversible error in relying on determinations of other government agencies in making its own determination.

Mother's Brief at 4.  Although Mother included a broader attack on the trial court's decision in her Rule 1925(b) Statement, including a claim that the court "improperly denied protection of the children" despite "uncontroverted evidence" of abuse, and that the decision was "against the manifest weight of the evidence," Mother does not present those issues in her appeal.[17]

Our standard of review is as follows:

[I]n a PFA action, we review the trial court's legal conclusions for an error of law or abuse of discretion.  In **Commonwealth v. Widmer**, 560 Pa. 308, 322, 744 A.2d 745, 753 (2000), our Supreme Court defined "abuse of discretion" in the following way: . . .

Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

Credibility of the witnesses and the weight accorded their testimony is within the exclusive province of the judge as fact finder.

**Mescanti v. Mescanti**, 956 A.2d 1017, 1019–20 (Pa. Super. 2008) (some formatting and citations omitted).  "The admission of evidence is committed to the sound discretion of the trial court and an appellate court may reverse

---

[17] On March 21, 2017, Mother filed a motion for expedited review with this Court, which was granted on April 3, 2017.  This Court ordered that this "appeal shall be listed before the first Panel available following the filing of all briefs . . .; the expedited listing of this appeal, however, shall not supersede the listing of any family fast-track appeal."  Order, 4/3/17.

only upon a showing that the trial court clearly abused its discretion."

***Commonwealth v. McFadden***, 156 A.3d 299, 309 (Pa. Super. 2017)

(citation omitted).

## Character Evidence

First, Mother contends that the trial court "abused its discretion in admitting [improper] character evidence, resulting in the taint of the entire trial" in violation of Rule 404 of the Rules of Evidence. Mother's Brief at 8. Mother explains this contention as follows:

> Father attempted . . . to prove his case by the improper admission of character evidence. The improperly admitted character evidence infected every facet of the trial and, therefore, a new trial is required with a new judge who has not been likewise infected by Father's character assassination of Mother. . . .
>
> Father was pointing to the history of the poor relationship between himself and Mother to suggest (and only merely suggest, as Father had no evidence that Mother had, in fact, tainted anyone's testimony) that the children's testimony could not be trusted because Mother must have implanted the ideas in the children's heads. He intended, therefore, to show a history of him and Mother not getting along to advance his case by creat[ing] unfair prejudice in the mind of the [t]rial [c]ourt.

***Id.*** In her appellate brief, Mother argues that Father failed properly to raise an allegation of taint prior to A.B.-W.'s testimony. Mother argues that Father was foreclosed from invoking taint because the parties had stipulated that A.B.-W. was competent to testify. Mother's Brief at 10-11 ("the question of taint is one of competency and not of credibility"). Although Mother makes her argument in general terms, she focuses almost

- 24 -

exclusively on the testimony by Dr. Katz to make her argument. ***See id.*** at 9-10. Mother asserts that, the admission of Dr. Katz's testimony, which included excerpts from his report being read into the record, was error because it "permitted the specter of taint to impact [the trial court's] credibility determinations." ***Id.*** at 12.

Father responds: "Nowhere does the trial court state or imply that it based its decision upon character evidence. Instead, the trial court based its decision upon the credibility of witnesses. Determining the credibility of witnesses is 'within the exclusive province of the [trial c]ourt.'" Father's Brief at 7 (internal brackets omitted) (quoting ***Mescanti***, 956 A.2d at 1019-20). Father adds that "the trial court 'while passing upon the credibility of witnesses and the weight of the evidence produced, [was] free to believe all, part or none of the evidence.'" ***Id.*** (quoting ***Commonwealth v. Ratsamy***, 934 A.2d 1233, 1237 (Pa. 2007)). Father continues that, under the Pennsylvania Rules of Evidence, "[a]ny party, including the party that called the witness, may attack the witness's credibility" and "[t]he credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statute or these rules." ***Id.*** at 9 (quoting Pa.R.E. 607(a)-(b)).

In rejecting Mother's Rule 404 argument, the trial court stated that the only portion of Dr. Katz's testimony that could possibly be of issue was that relating to A.B.-W.'s foot injury and that the court did not believe that

testimony "constitutes impermissible character evidence." Trial Ct. Op. at 15. The court explained:

> Dr. Katz merely appears to be noting his belief that [A.B.-W.] may have thought Father broke his toe because Mother "hypothesiz[ed]" that Father could have stepped on it as she did not otherwise "understand why it was broken." [N].T. at 103. The [trial c]ourt does not perceive any particular character trait in such testimony — and certainly not a negative one — except, perhaps, curiosity, and the [trial c]ourt will not scour the remaining portions of Dr. Katz's testimony to find other possible references to Mother's character when Mother herself has not identified them for the [trial c]ourt's analysis.
>
> Accordingly, the Court concludes that — based on its construction of Mother's otherwise vague claim — no error occurred. That said, even if some character evidence was erroneously admitted through Dr. Katz — as Mother appears to contend — such error would not entitle Mother to relief. As set forth above, the [trial c]ourt's decision to deny the PFA petition was not grounded — in whole or in part — on Dr. Katz's testimony. Any character evidence wrongly admitted through the same thus had no bearing on the result in this case and cannot, consequently, form the basis for reversing th[e trial c]ourt's order.

*Id.* at 15-16; *see also id.* at 10 ("even if Dr. Katz's testimony should not have been admitted and was, rather, excluded from the hearing, the end result would have been the same: the denial of Mother's PFA petition").

Pennsylvania Rule of Evidence 404 states, in relevant part: "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Pa.R.E. 404(a)(1). For both evidence of positive character traits and of "bad character," "Pennsylvania law generally limits proof of character evidence to a person's reputation, and opinion evidence cannot be used to

prove character." ***Commonwealth v. Reyes-Rodriguez***, 111 A.3d 775, 781 (Pa. Super. 2015) (*en banc*) (citing Pa.R.E. 405(a)), ***appeal denied***, 123 A.3d 331 (Pa. 2015). Beyond this limitation, Pennsylvania cases have not extensively explored the meaning of "character or character trait" under Rule 404(a)(1).[18]

Black's Law Dictionary (10th ed. 2014) defines "character evidence" as "[e]vidence regarding someone's general personality traits or propensities, of a praiseworthy or blameworthy nature; evidence of a person's moral standing in a community." West's Pennsylvania Practice § 404-1 (4th ed.)

_____

[18] This Court has devoted the most attention to "evidence of good character offered by a defendant in a criminal prosecution," where it has fashioned some additional limitations. ***See Commonwealth v. Lauro***, 819 A.2d 100, 109 (Pa. Super. 2003) ("Evidence of good character offered by a defendant in a criminal prosecution must be limited to his general reputation for the particular trait or traits of character involved in the commission of the crime charged. . . . Such evidence must relate to a period at or about the time the offense was committed and must be established by testimony of witnesses as to the community opinion of the individual in question, not through specific acts or mere rumor" (emphasis and internal quotation marks omitted; some formatting altered) (citing ***Commonwealth v. Luther***, 463 A.2d 1073, 1077 (Pa. Super. 1983)); ***see also Commonwealth v. Gaines***, 75 A.2d 617, 620 (Pa. Super. 1950) ("Evidence of good character is substantive and positive evidence, not a mere make-weight to be considered in a doubtful case, and is an independent factor which may of itself engender a reasonable doubt or produce a conclusion of innocence" (citation omitted; some formatting altered)). However, these cases are not clear as to whether they apply beyond defendants offering evidence of good character traits in criminal matters, and thus whether they would apply to the instant action, which is both a civil matter and allegedly involves evidence of bad character. The application of these cases to other contexts is problematic, because Pa.R.E. 404(a)(2) allows for some exceptions to the ban on character evidence for a defendant in a criminal case that do not apply in any other context.

states (without citing authority): "The term 'character evidence' embraces all evidence that is probative of a character trait of a witness, a party, or some other person or entity whose behavior or nature is pertinent to the proceeding." Prior to adoption of the Federal Rules of Evidence, the United States Supreme Court noted that "[w]hat commonly is called 'character evidence' is only such when 'character' is employed as a synonym for 'reputation.'" *Michelson v. United States*, 335 U.S. 469, 477 (1948).[19] Examples of character evidence cited by Pennsylvania courts include: whether an employee was habitually reckless and careless in his work, in an action for negligently employing an unfit person, *Rosenstiel v. Pittsburg Rys. Co.*, 79 A. 556 (Pa. 1911); proof of a "bad reputation" in a libel action, *Bausewine v. Norristown Herald*, 41 A.2d 736, 742 (Pa.), *cert. denied*, 326 U.S. 724 (1945); "evidence of [a party's] good military record," *Butler v. Flo-Ron Vending Co.*, 557 A.2d 730, 733 (Pa. Super.), *appeal denied*, 567 A.2d 650 (Pa. 1989); and a reputation for dishonesty, *Commonwealth*

---

[19] Other jurisdictions have defined "character" as a "fixed disposition or tendency, as evidence to others by the man's habits of life," *Keith v. State*, 152 S.W. 1029, 1030 (Tenn. 1913), or "a person's tendency to act in a certain way in all varying situations of life." *State v. Dan*, 20 P.3d 829, 830 (Or. Ct. App. 2001) (quoting *State v. Carr*, 725 P.2d 1287, 1290 (Or. 1986) (*en banc*)). "We may use decisions from other jurisdictions 'for guidance to the degree we find them useful and not incompatible with Pennsylvania law.' *Trach v. Fellin*, 817 A.2d 1102, 1115 (Pa. Super. 2003) (*en banc*), *appeal denied*, 577 Pa. 725, 847 A.2d 1288 (2004)." *Newell v. Montana West, Inc.*, 154 A.3d 819, 823 n.6 (Pa. Super. 2017).

*v. Boring*, 684 A.2d 561, 569 (Pa. Super. 1996), *appeal denied*, 689 A.2d 230 (Pa. 1997).

Based upon these definitions and examples, we agree with the trial court that Mother's objection to Dr. Katz's testimony does not qualify as an objection to "character evidence" that is subject to Rule 404. Neither Father nor Dr. Katz claimed that Dr. Katz's testimony demonstrated any particular trait, disposition, or tendency of Mother, and Mother does not identify any particular trait that is suggested by Dr. Katz's testimony. *See* Mother's Brief at 8-14. Dr. Katz merely noted his belief that A.B.-W. may have thought Father broke A.B.-W.'s toe, because Mother "hypothesize[d]" that Father could have stepped on it and could not otherwise "understand why it was broken." Trial Ct. Op. at 15; N.T. at 103.

Though she does not state her argument clearly, Mother apparently contends that Dr. Katz's testimony provided an example of Mother's tendency to suggest unfounded hypotheses to A.B.-W. and thereby to taint his description of events that occurred. But the testimony by Dr. Katz to which Mother objected did not describe Mother's character; it merely told a story about an event that occurred regarding A.B.-W.'s toe. N.T. at 100. Testimony about a factual event is not inadmissible testimony that a person has a particular character. For example, in *Commonwealth v. Briggs*, 12 A.3d 291, 337-38 (Pa.), *cert. denied*, 565 U.S. 889 (2011), a witness's brief mention of the defendant's previous purchase of a firearm from him

was held not to have been offered to show that the defendant was a person of bad character, but instead merely to establish the prior relationship between the witness and defendant and to show the defendant's ability to acquire handguns.[20]  Similarly, here, Father merely introduced evidence though Dr. Katz's testimony about a factual event — specifically, Mother's conversation with A.B.-W. about A.B.-W.'s toe injury — not inadmissible testimony that Mother has a particular character trait, such as dishonesty.[21]

Mother additionally contends that "Father advanced his theory of taint improperly and did not raise it as a question of competency, but of credibility, which had the effect of infect[ing] the entire trial."  Mother's Brief at 7.  Father responds that "the possibility of taint regarding [A.B.-W.]'s testimony [was] not objected to at trial, nor [was it] included in Mother's

---

[20] In **Commonwealth v. Fulton**, 830 A.2d 567, 573 (Pa. 2003), the Supreme Court drew a similar distinction between testimony contradicting facts and character evidence about a reputation for honesty:

> [W]here the prosecution has merely introduced evidence denying or contradicting the facts . . . but has not assailed the defendant's community reputation for truthfulness generally, evidence of the defendant's alleged reputation for truthfulness is not admissible.  Similarly, cross-examination of the defendant that challenges the veracity of his testimony in the particular case, but does not touch upon his general reputation in the community for being truthful, does not open the door to the introduction of good character evidence concerning reputation for truthfulness.

830 A.2d at 573 (internal citations omitted).

[21] Father never articulated why he presented this evidence.

1925(b) Statement." Father's Brief at 10. Father therefore suggests Mother waived this issue.[22]

In **Commonwealth v. Delbridge**, 855 A.2d 27 (Pa. 2003), the Supreme Court of Pennsylvania held that allegations of taint of a child witness should result in a competency hearing. It explained that issues of taint with children are a concern, because:

> The capacity of young children to testify has always been a concern as their immaturity can impact their ability to meet the minimal legal requirements of competency. Common experience informs us that children are, by their very essence, fanciful creatures who have difficulty distinguishing fantasy from reality; who when asked a question want to give the "right" answer, the answer that pleases the interrogator; who are subject to repeat ideas placed in their heads by others; and who have limited capacity for accurate memory.

*Id.* at 39-40. However, here the parties agreed that A.B.-W. was competent to testify, N.T. at 5, and so both of them waived any contention that A.B.-W.'s competency was at issue as a result of taint allegations. Mother now apparently contends that because no party challenged A.B.-W.'s competency, Father was precluded from arguing that A.B.-W.'s testimony was not credible, and that the trial court was similarly precluded from making credibility determinations regarding the child. We disagree.

The Supreme Court distinguished between competency and credibility in **Delbridge**:

---

[22] The trial court did not directly address this aspect of Mother's issue in its opinion.

> A competency hearing concerns itself with the minimal capacity of the witness to communicate, to observe an event and accurately recall that observation, and to understand the necessity to speak the truth. A competency hearing is not concerned with credibility. Credibility involves an assessment of whether or not what the witness says is true; this is a question for the fact finder. An allegation that the witness's memory of the event has been tainted raises a red flag regarding competency, not credibility. Where it can be demonstrated that a witness's memory has been affected so that their recall of events may not be dependable, Pennsylvania law charges the trial court with the responsibility to investigate the legitimacy of such an allegation.

855 A.2d at 40 (citations omitted). The Court's explanation makes clear that competency is an important threshold question, but nothing in **Delbridge** holds that a witness found to be competent cannot then be found incredible. The "ability to correctly remember the events in question is properly a question of credibility, and not of taint." **Commonwealth v. Moore**, 980 A.2d 647, 652 (Pa. Super. 2009), **appeal denied**, 991 A.2d 311 (Pa. 2010). Credibility is always an appropriate issue in assessing a witness's testimony.

The trial court never stated that it found A.B.-W.'s testimony to be tainted; it only found that A.B.-W. was not credible. Trial Ct. Op. at 6-7, 9-10. Moreover, the trial court explicitly stated that it did not rely on Dr. Katz's testimony, either in whole or in part, to deny Mother's PFA petition. Trial Ct. Op. at 10, 16. Therefore, even if Dr. Katz's testimony was improperly admitted on a taint issue, the trial court has advised that it did not decide the case on that basis. "[A] trial court acting as the fact-finder is presumed to know the law, ignore prejudicial statements, and disregard

inadmissible evidence." *McFadden*, 156 A.3d at 309 (citation and internal quotation marks omitted). Thus, even if this evidence was improperly admitted and even if the trial court had not explicitly stated that this evidence had no bearing on its ruling, we would still conclude that the trial court properly disregarded it. Trial Ct. Op. at 10; *see also id.* at 16; *McFadden*, 156 A.3d at 309.

To summarize, Dr. Katz's testimony did not disparage Mother's character, and Dr. Katz testified that Mother was not trying deliberately to alter A.B.-W.'s memory. Mother cannot succeed on her legal arguments because this testimony is neither character evidence nor adverse to her. Even assuming her arguments had merit, the trial court explicitly stated that it did not rely on Dr. Katz's testimony, and, thus, there is no prejudice to Mother. Therefore, we hold the trial court did not abuse its discretion regarding the testimony by Dr. Katz. *McFadden*, 156 A.3d at 309.[23]

_____

[23] In her brief, Mother also argues that Dr. Katz's testimony should have been deemed inadmissible, because the stipulation and order from the California family court that permitted his retention stated that Dr. Katz's report was to be used only in the California court and, she continues, allowing its use in Pennsylvania violated the Full Faith and Credit Clause of the United States Constitution. Mother's Brief at 10. Our review of the record discloses that Mother failed to raise this issue during the PFA hearing; Mother's counsel did not explicitly argue the trial court should comply with the California order pursuant to the Full Faith and Credit Clause. *See* N.T. at 90-91. Thus, Mother failed to preserve this issue for our review. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal"). In addition, Mother's statement of issues in her brief does not include this issue, so that it is not before us. *See* Pa.R.A.P. 2116(a).

**Determinations by Government Agencies**

Mother's second issue — "[w]hether the [t]rial court abused its discretion and committed reversible error in relying on determinations of other government agencies in making its own determination" — was not included in Mother's Rule 1925(b) Statement.[24]  An issue that is not included in a Rule 1925(b) statement cannot be raised for the first time on an appeal to this Court.  *See Commonwealth v. Castillo*, 888 A.2d 775, 780 (Pa. 2005) ("Any issues not raised in a Pa.R.A.P.1925(b) statement will be deemed waived").  Hence, Mother's second issue was not preserved for our review.

---

[24] The issues raised in that statement were:

>  1.    The [trial c]ourt improperly admitted character evidence against Mother in contravention of Pa.R.E. 404;
>
>  2.    The [trial c]ourt improperly admitted the testimony of Dr[.] Stan Katz in contravention to the parties' joint stipulation filed in their California custody matter, which stipulation was also made an order of the Superior Court of Los Angeles County. Admission of Dr[.] Katz's testimony violated the terms of the parties' stipulation and the Full Faith and Credit clause of the United States Constitution;
>
>  3.    The [trial c]ourt improperly denied protection for the children when uncontroverted evidence was presented that Father had sexually abused at least his son;
>
>  4.    The [trial c]ourt's decision was against the manifest weight of the evidence.

Even if this second issue were preserved for our review,[25] it is meritless. Mother contends that the trial court based its decision on the fact that CYF concluded the sexual abuse allegations were unfounded and that the police declined to charge Father. She argues that the court therefore committed an error similar to that in **Boykin v. Brown**, 868 A.2d 1264 (Pa. Super. 2005), where we reversed a trial court's decision because it abdicated its fact-finding responsibility by deferring to the decisions of others. Mother's reliance on **Boykin** is misplaced.

In **Boykin**, the trial court impermissibly delegated all of its fact-finding and credibility responsibilities to the District Attorney:

> After the parties testified, the PFA judge stated that he was going to withhold his decision until the police decided whether to file criminal charges against Brown based on the incident of January 4, 2004. The PFA judge indicated that he would grant the PFA Petition if the police filed criminal charges against Brown based upon that incident, but would deny the PFA Petition if the police did not file charges. . . . [R]ather than applying the preponderance of the evidence standard to Boykin's PFA Petition, the PFA court deferred its decision to the District Attorney's office, and indicated that it would base its PFA ruling on the District Attorney's decision as to whether to prosecute Brown on criminal charges. By allowing the PFA decision to be determined, in effect, by the District Attorney's office, the PFA court permitted the decision to be made based on a standard of criminal culpability. This clearly was error. . . . Thus, a

---

[25] Mother stated in her Rule 1925(b) statement that she could not discern the trial court's reasons for denying her PFA petition in its January 31, 2017 order, and she contends in her brief that she thus could not have known to include this issue. **See** Mother's Brief at 14. The trial court did not state its reasons until it prepared its Rule 1925(a) decision, which observed that CYF concluded the sexual abuse allegations were unfounded and that the police declined to charge Father.

determination by a District Attorney or the police as to whether to file criminal charges against a defendant in a PFA proceeding is not relevant to the PFA court's decision.

***Boykin***, 868 A.2d at 1265–66  (citations to the record omitted); ***see also***

***Karch v. Karch***, 885 A.2d 535, 538 (Pa. Super. 2005) (credibility determinations cannot be based on whether or not police choose to act against the alleged perpetrator).

In the current case, the trial court did not make its decision whether to grant a PFA order contingent on any decision of the district attorney not to prosecute Father, of the police not to bring charges, or of CYF to deem all reports of abuse by Father unfounded.  It merely considered the conclusions of other authorities as part of its overall fact-finding — one of the many pieces of evidence it reviewed in order for it to understand the totality of the factual circumstances.  ***See*** Trial Ct. Op. at 2; ***Mescanti***, 956 A.2d at 1023. Accordingly, ***Boykin*** is not applicable to the current facts, ***see*** 868 A.2d at 1265, and Mother's second issue is without merit.

\*     \*     \*

We have concluded that the two issues raised by Mother do not entitle her to relief.  And yet, we find the facts of this case deeply troubling.  Two young children have stated that they were sexually abused.  One of them testified in court, where he gave detailed and graphic testimony about that abuse and then, when his testimony was completed, volunteered more testimony about abuse before he left the stand.  Other witnesses gave

testimony supporting the claims. But, the evidence was hotly disputed, and several witnesses gave testimony that undermined or contradicted the claims of abuse. In the end, the trial court chose to believe Father's denials and not to believe the children. Mother's appeal does not challenge that judgment, and instead raises only two evidentiary matters that we conclude are meritless.

It is, of course, fundamental in our system of justice that the role of a trial court in a non-jury matter is to hear witnesses, assess credibility, and resolve factual disputes. We depend on our trial judges to faithfully carry out that difficult duty, and we will not substitute our judgment for theirs. ***See McElrath v. Commonwealth***, 592 A.2d 740, 745 (Pa. Super. 1991). We are mindful of that restriction here. Accordingly, and constrained by our standard of review, we affirm the decision by the trial court.

Order affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/16/2017